[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I.
The Statewide Grievance Committee, hereinafter, the Committee, filed the instant presentment on March 26, 1999,[1]
seeking disciplinary action against Mario L. Mozzillo, hereinafter, the respondent, for alleged violations of Rules 1.15(b)[2] and 8.4(3)[3] of the Rules of Professional Conduct. The Committee essentially alleged the respondent improperly invested funds that William R. Lewis entrusted to him.
At the hearing on May 19, 1999, Lewis testified that the respondent approached him at the local YMCA, where they were both members, and advised him that if he invested his money with the respondent, he could earn a high rate of interest with absolutely no risk. Lewis, in fact, did invest small amounts — approximately $500 — on a number of occasions. Although Lewis did not provide any specifics regarding these investments, each was to be held in a separate account with no risk of loss and guaranteed to return interest at the rate of 20 to 25 percent.
Lewis' testimony focused on four documents, the first being a memorandum dated December 11, 1989, from the respondent, as trustee, acknowledging "the receipt of $20,000 for [an] option of a building lot . . . [in] Orlando, Florida. Development closing will take place 9-18 months from January 7, 1990." Lewis testified that although neither he nor the respondent drafted the document, the respondent had instructed him on how to do so. Lewis further testified that the transaction was not a loan.
The second document dated October 30, 1990, was a $25,000 note payable on July 1, 1991, from the respondent, as trustee, to Lewis. Added to the printed text was a handwritten notation stating that $20,000 is principle and $5,000 is interest. Another notation indicated that on November 22, 1991, $5,000 interest was paid on July 1, 1991, and that on November 29, 1991, $2,343 interest was paid to November 1, 1991, with a principal balance CT Page 16268 of $20,000 remaining. Lewis testified that he only gave the respondent $20,000 and that, like the first document, he did not prepare this document, although the respondent gave him instructions on how to do so. Lewis further testified that his wife may have prepared the document.
The third document, dated July 3, 1989, was a $60,000 note payable in one year from the respondent, as trustee, to Lewis. On the face of the note were three handwritten additions. The first stated that $5,600 in interest was paid to November 15, 1991. The second indicated a "principal of $20,000, $4,000 interest for 1 year or 20% per year," and the third notation crossed out the original date and inserted July 13, 1991. The final document dated October 24, 1991, was a $31,260 note, from the respondent, as trustee, to Lewis. This note did not mention interest, nor were there any handwritten notes on it.
Lewis testified that all the monies were to be fully protected in a separate account, which would be accessible at all times. According to Lewis' testimony, however, he never received the total principal of all the sums of $91,260. Lewis testified that although he contacted the respondent many times, he was unable to collect the money from the respondent.
Finally, Lewis indicated that in addition to his own money, part of the total investment included $10,000 of his mother's money and $55,000 from a Mr. Popacoda. Absolutely no documentary evidence was presented, however, regarding these transactions. At the hearing, Popacoda testified that he did not possess any written documentation and that he had never met the respondent prior to giving Lewis the $55,000. Moreover, the Committee's pleadings were silent as to these latter investments.
Lewis was questioned about the notes and whether the reason they were silent about interest payments was to avoid the payment of taxes. He also was questioned as to why, if he had been in charge of drafting the instruments, they did not include the above-mentioned guarantees. Lewis was examined as to why he had not complied with a subpoena commanding him to bring to the hearing all documents, checks, returns and records for the years and transactions in question. He was evasive in his answers, commenting only that he brought the above discussed four documents.
Lewis was further questioned about five checks from the CT Page 16269 respondent.[4] Lewis stated that although the checks totaled $90,157.98, they were unrelated to the four documents previously discussed. According to Lewis' testimony, the checks were related to other investments that were all paid with corresponding notes, which were destroyed by the respondent. Lewis provided no specifics as to these other transactions. Lewis testified that the July 10, 1990 check for $40,000 was unrelated to the $60,000 note dated July 3, 1989 (and modified July 13, 1990) which was reduced to $24,000 with the notation "principal of $20,000[;] $4,000 interest for 1 yr. At 20% per year." Lewis further testified that he received a total of $103,100.98 from the respondent, but that he was unable to state how much he had paid to Popacoda. Popacoda testified that he gave his money to Lewis to pass on to the respondent and that with the exception of the notes discussed above, no written documentation existed.
The respondent's testimony differed. He stated that Lewis approached him at the YMCA after listening to the respondent's conversation with others, requesting to participate in the investments. The respondent indicated that he tried to discourage Lewis as he and his partners had been signing mortgages. According to the respondent, he neither guaranteed that Lewis' money would be held in a special account or that the investments would be free from risk. The respondent testified that he paid no attention to the term "trustee" written on the above discussed notes. He further stated that he never ripped up paid notes and that many of his documents were destroyed in 1994 in a house fire in which his niece was murdered.
The respondent explained that the investment discussed in exhibit one was included in the $60,000 note. It was not a separate promise. He further testified that the October 30, 1990 note and the July 30, 1989 notes did not have an expressed interest rate because "that is the way it was presented to me and I did not inquire." The respondent indicated that the $20,390 check dated December 11, 1991, was payment on the $25,000 note dated October 30, 1990. He also testified that the $21,252.26 check dated December 10, 1992, and the $8,580 check dated October 24, 1991, were payments on the $31,260 note dated October 24, 1991.
Lewis countered with a new exhibit which referred to the $31,260 note as well as a sum of $21,781.13. Lewis testified that the $21,252.26 check together with a $1,530 cheek dated September 29, 1994, were payments on the later sum [$22,782.76]. The CT Page 16270 respondent testified that he was not familiar with the new exhibit.
 II. A.
The Committee has the burden of proving the allegations of the complaint by clear and convincing evidence. StatewideGrievance Committee v. Whitney, 227 Conn. 829, 838, 633 A.2d 296
(1993). This standard requires a "degree of belief that lies between the belief that is required to find the truth or existence of the issuable fact in an ordinary civil action and the fact that is required to find guilt in a criminal prosecution." Lopinto v. Haines, 185 Conn. 527, 534, 441 A.2d 151
(1981). The facts of this case require a finding by this court that the Committee has failed to meet that higher standard of proof. There are too many inconsistencies between the testimony and the evidence for the court to reach any other conclusion.
 1.
The testimony concerning even the most basic details of the transactions at issue is questionable. A series of transactions was alleged, yet the parties provided little, if any, documentation of the details involved. Although Lewis's testimony focused on four written documents, neither he nor the respondent prepared them. Furthermore, Lewis could not recall whether his wife prepared the documents. Essentially, this court was told that over $200,000 was invested and only $103,000 was repaid. The allegations of the complaint and the evidence produced at the hearing, however, at best show that only $136,260 was invested.
This court finds Lewis' emphatic statements that these transactions, basically oral in nature, were guaranteed to be risk-free and high yielding and that the principal would be available at all times to be questionable. As to the first document, the so called option memorandum, this court is simply unable to decipher its real intent. Lewis stated that it was not a loan. Regardless of whether it was a loan, the option memorandum does not meet any of the specificity requirements for a land transaction. Further, the parties failed to provide any testimony regarding the details of the purchase of the lot. See General Statutes § 52-550; compare Foley v. Huntington Co.,42 Conn. App. 712, 729, 682 A.2d 1026, cert. denied, CT Page 16271239 Conn. 931, 683 A.2d 398 (1996).
This court further finds Lewis' statement that Popacoda invested $55,000 and the absence of any documentation thereon, at best, curious. Popacoda testified that through Lewis he gave the respondent this sum of money without so much as a receipt. Interestingly, Lewis was unable to state how much money, if any, he had paid Popacoda. The same may be said about Lewis' reference to his mother's investment of $10,000. The court further notes that the Committee's petition does not mention these individuals.
 2.
The court's attempts at reconstructing the payments between the parties has proven difficult as a consequence of Lewis' failure to respond to a subpoena, issued by the respondent's attorney, ordering him to bring to the hearing any checks, documents or records concerning the alleged transactions. Lewis' explanation that he believed he did not have to bring any other records, except the four written documents, is simply unsatisfactory.
While Lewis denied that the December 11, 1991 check, in the amount of $20,390 was payment of the $25,000 note, the parties do not dispute that the respondent made interest payments of $5,000 on July 1, 1991, and $2,343 on November 29, 1991, for interest through November 15, 1991. With a payment of $20,390 on December 11, 1991, less than a month after the last interest payment, the additional $390 is surely in the range of a month's interest at 20 percent ($333) or at 25 percent ($416). Indeed, at the 25 percent interest rate, the per diem rate is $13.88 x 26 days or $361. Lewis testified that the payment did not apply to the $25,000 note; he provided no further explanation. This court is not convinced.
This court also is not convinced that the $40,000 payment of July 10, 1999, is not the same payment reflected in the notation found on the $60,000 note, in which the original date was crossed out and replaced by the date of July 13, 1990, and the $60,000 figure was deleted and replaced by "principal of $20,000[;] $4,000 interest for 1 year or 20% per year." Finally, this court finds that the $8,580 check dated October 24, 1991, the $21,252.26 check dated December 10, 1992, and the $1,530 check dated September 29, 1994, for a total of $31,362.26, reflect payment on the $31,260 note. CT Page 16272
In conclusion, this court does not find that the petitioner met its burden of proof that the respondent failed to repay the alleged $91,260. Moreover, the evidence presented to the court suggests the opposite. These findings, however, do not end the matter.
 B.
The Committee has not alleged that the respondent was acting as Lewis' attorney during these transactions. Nevertheless, as our Supreme Court discussed in In Re Application of Pagano,207 Conn. 336, 345, 541 A.2d 104 (1988) quoting, In Re Peck,88 Conn. 447, 450-51, 91 A.2d 274 (1914), "[a]n attorney at law admitted to practice, and in the exercise of the right thus conferred to act as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of the professional privilege may and ought to be declared forfeited. As important as it is that an attorney be competent to deal with the oftentimes intricate matters which may be entrusted to him, it is infinitely more so that he be upright and trustworthy." (Internal quotation marks omitted.) "Unfortunately, it is not easy to limit membership in the profession to those who satisfy the standard of fitness. But scant progress in that direction can be hoped for if, in the determination of the qualification of professional fitness, nonprofessional dishonor and dishonesty in whatsoever path of life is to be ignored. Professional honesty and honor are not to be expected as the accompaniment of dishonesty and dishonor in other relations. So it is that we, in common with other courts, hold, as did Lord Mansfield more than a century ago, that misconduct, indicative of moral unfitness for the profession, whether it be professional or nonprofessional, justifies dismissal as well as exclusion from the bar." In Re Peck, supra, 450-51.
Indeed, in Statewide Grievance Committee v. Presnick,18 Conn. App. 316, 324, 559 A.2d 220 (1989), the Appellate Court CT Page 16273 held: "It is firmly established that misconduct of an attorney, whether it be in the practice of the profession or in matters dehors the practice of law, justifies discipline, including exclusion from the bar." Both parties thus agree that the respondent is required to comply with the Rules of Professional Conduct although he was not acting as Lewis' attorney.
Rule 1.15(b) provides in relevant part that "a lawyer shall promptly deliver to the . . . third person any funds or property that . . . the third person is entitled to receive and, upon request by the . . . third person, shall promptly render a full accounting regarding such property." While the actual amounts paid by the respondent are subject to dispute, every analysis of the evidence requires a finding that the respondent did not promptly pay the funds. Therefore, the respondent technically failed to comply with Rule 1.15(b). It must be stressed that the required payments resulted from investment transactions as opposed to a traditional attorney-client fiduciary relationship.
The question of whether the respondent violated Rule 8.4(3) is a different matter. Rule 8.4 provides in relevant part that "[i]t is professional misconduct for a lawyer . . . (3) to engage in conduct involving dishonesty, fraud, deceit or misrepresentation." This court already has found that the petitioner failed to prove by the clear and convincing evidence standard that the respondent failed to repay funds entrusted to him for investment purposes. The Committee has also failed to prove that the respondent's conduct automatically constituted a violation of Rule 8.4(3); failure to pay a debt in a timely manner does not ipso facto constitute dishonesty, fraud, deceit or misrepresentation. It may, of course, but that requires proof which does not exist in this case.
 C.
The Committee instituted the present litigation, claiming that Lewis delivered $91,260 to the respondent and that these funds were not returned. It failed to prove this allegation. This court has found, however, that the respondent violated Rule 1.15(b). Accordingly, a reprimand is ordered.
Berger, J.